UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JESSICA R. RESCH,

        Plaintiff,

v.                                     Case No. 18-C-710

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

**DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION**

Plaintiff Jessica R. Resch filed his action for judicial review of a decision by the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Resch contends that the administrative law judge's (ALJ) decision is flawed and requires remand for two reasons: (1) the ALJ erred in evaluating Resch's subjective symptoms and related limitations and (2) the ALJ erred in relying on the state agency physician opinions. For the reasons that follow, the decision of the Commissioner will be affirmed.

**BACKGROUND**

Resch first completed an application for a period of disability and disability insurance benefits on June 28, 2011, alleging disability beginning July 1, 2009. Her application was denied initially and on reconsideration. Resch subsequently requested an administrative hearing before an ALJ, and on March 13, 2013, ALJ Thomas J. Sanzi held a hearing. Resch amended her alleged onset date to February 1, 2011. On April 2, 2013, ALJ Sanzi concluded that Resch was not disabled

under the Social Security Act. R. 66. ALJ Sanzi's decision became the final decision of the Commissioner when the Appeals Council denied Resch's request for review on March 27, 2014. R. 71–74.

On May 1, 2014, Resch, age 30 at the time, filed a second Title II application for a period of disability and disability insurance benefits beginning August 1, 2011. R. 196. She listed vertigo, migraines, depression, hypothyroidism, and fibromyalgia as the conditions that limited her ability to work. R. 226. Following the denial of her application initially and on reconsideration, Resch requested a hearing before an ALJ. ALJ Karen Sayon conducted a hearing on June 1, 2017. Resch, who was represented by counsel, and a vocational expert (VE) testified.

At the outset, Resch amended her onset date to August 4, 2014, and her counsel indicated that she sought a closed period of disability from August 4, 2014 through December 31, 2014. R. 36. At the time of the hearing, Resch lived in a house with her husband in Bryant, Wisconsin. R. 38. She testified that her husband drove her to the hearing because she experiences vertigo and feels unsteady driving. R. 39. Resch graduated from college with a degree in health promotion and wellness. *Id.* From 2006 to 2009, Resch worked as a wellness coordinator for Landlake Hospital. R. 40. The position was grant-funded and its funding lapsed in June 2009. R. 45. Resch did not engage in any other substantial gainful activity after her position had been terminated.

Resch's attorney indicated her medically determinable severe impairments included dizziness and migraines. R. 37. Resch testified that she had three to seven headaches every month, each lasting 12 hours to four days. R. 40. She took Ibuprofen, Citalopram, Cardizem, and Jolessa for the headaches. R.41–42. Resch indicated that her headaches were more frequent and intense when her doctors modified her medications. R. 46. She reported that she has vertigo every day, but

2

flare-ups occur three to seven days each month. R. 42. Resch stated that her vertigo increased when she had a headache. She testified that the vertigo causes her to feel unsteady and prevents her from engaging in physical activity that lasts longer than five to ten minutes. R. 43.

Resch also testified about her average day. She reported that she gets out of bed, takes her medication then eats breakfast, walks to get the mail, eats lunch, watches television, eats supper, then goes to bed. R. 44. She does not do any chores and sporadically uses a computer. R. 45. When she does leave the house, she cannot be gone for more than four hours. R. 46. On days when she has a migraine, she stays in bed all day and puts an ice pack on her neck.

In a written decision dated June 8, 2017, the ALJ concluded Resch was not disabled at any time from August 4, 2014, the alleged onset date, through December 31, 2014, the date last insured. R. 17–27. Following the agency's five-step sequential evaluation process, the ALJ concluded at step one that Resch last met the insured status requirements of the Social Security Act on December 31, 2014, and did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured. R. 19. At step two, the ALJ found Resch had the following severe impairments: migraine headaches, dizziness/vertigo, and obesity. *Id.* At step three, the ALJ determined Resch's impairments or combination of impairments did not meet or medically equal any listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 21.

After reviewing the record, the ALJ concluded Resch had the residual functional capacity (RFC) through the date last insured to "perform medium work as defined in 20 C.F.R. § 404.1567(c) except she could not be exposed to hazards, defined as work at heights or around dangerous moving machinery like a forklift. Any work must have been performed in an environment with a noise intensity level of 1, 2, or 3, as defined in the Dictionary of Occupational Titles." R. 22. The ALJ

found at step four that Resch was unable to perform her past relevant work as a health service coordinator. R. 25. She nevertheless found at step five that there were jobs that existed in significant numbers in the national economy that Resch could have performed, including linen room attendant, laundry worker, and marker. R. 26. Based on these findings, the ALJ concluded Resch was not disabled within the meaning of the Social Security Act from August 4, 2014, through December 31, 2014. R. 27. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Resch's request for review. Resch then commenced this action for judicial review.

## LEGAL STANDARD

The final decision of the Commissioner will be upheld if the ALJ applied the correct legal standards and supported her decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusion drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Social Security Administration's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.

*Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

**A. Subjective Symptoms and Related Limitations**

Resch asserts that the ALJ erred in her assessment of Resch's subjective symptoms related to her migraines, vertigo, and fatigue. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms—that is, the claimant's subjective complaints—allegedly caused by her impairments. 20 C.F.R. § 404.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id*. "Signs" are "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms)." § 404.1502(g). The ALJ determines whether the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the objective medical evidence and the other evidence of record. SSR 16-3p.

A court's review of a credibility, or consistency, determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, courts "merely examine

5

whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted). The ALJ met this standard in this case.

Following the agency's two-step procedure for assessing a claimant's symptoms set out in SSR 16-3p, the ALJ concluded that Resch's medically determinable impairments could reasonably be expected to produce the alleged symptoms. R. 23. The ALJ nevertheless found that Resch's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.* The ALJ explained that the medical records generally show routine follow-up visits approximately every six months. Indeed, in the relevant time period, Resch only had two doctors' appointments: one in August 2014 and one in November 2014. R. 23–24. The ALJ noted that the clinical findings generally showed that Resch was alert and in no acute distress and do not document findings that she appeared fatigued, unsteady, or in pain. R. 23.

As to her migraines, the ALJ observed that Resch had a history of treatment for migraines prior to the alleged onset date and that the records during the relevant time period do not show significant worsening of her symptoms or functional limitations. In August 2014, Resch presented to a follow-up appointment with her neurologist and reported that she was not experiencing any pain and that she was relatively stable overall. She also indicated that she had headaches approximately

6

every other week on average. The doctor renewed her medication and advised Resch to return in six months. At a gynecological examination in November 2014, Resch reported no headache. At a February 2015 follow-up visit with her neurologist, which was two months after the relevant time period, Resch reported that she was doing better overall and that the frequency of her headaches remained the same. Resch also stated that her headaches were manageable with Ibuprofen. The ALJ recognized that Resch had a headache at this visit and that Resch rated her pain as a two on a 10-point scale. The doctor renewed Resch's medications. The ALJ explained that the medical records are not consistent with Resch's allegation of typical migraine pain of eight on a 10-point scale, and instead show that she generally reported that she was not in pain or reported pain of two on a 10-point scale. *Id.*

Regarding the dizziness, vertigo, and associated alleged limitations, the ALJ noted Resch's medical records show a history of treatment for dizziness prior to the alleged onset date. She observed that the records during the relevant period do not show significant worsening of her symptoms or functional limitations. At the August 2014 neurological visit, Resch reported continued dizziness but was alert and oriented upon examination. Her cranial nerves were intact, reflexes were symmetric, and coordination was intact. She also had full motor strength of the extremities, normal tone, and no pronator drift. The doctor renewed her medications and advised that she return in six months. *Id.* At the November 2014 examination, Resch was noted as alert and oriented. R. 24. The ALJ acknowledged that, at the February 2015 follow-up visit with her neurologist, Resch reported that her dizziness was about the same and worsened with standing. But she also reported that she was doing better overall. The doctor renewed her medications. Tilt table testing on February 13, 2015, revealed that Resch had features of postural orthostatic tachycardia

7

syndrome (POTS). A CT scan that same day showed evidence for superior semicircular canal dehiscence. *Id.* At an otolaryngology appointment in March 2015, Resch reported sensitivity to sound and that sound sometimes caused vertigo. Upon examination, however, Resch was not in acute distress. The doctor stated that it was very unlikely that superior canal dehiscence caused her symptoms. *Id.*

Absent from the medical records is any indication that Resch suffered from the severe and constant symptoms she described in her testimony during the time period under consideration. Resch asserts that the ALJ overlooked medical evidence showing that her headaches and dizziness had worsened. Yet the treatment notes Resch cites to support her argument were dated more than a year before the relevant time period under consideration. Resch also claims that she had side effects from her medications that the ALJ failed to consider. But the March 2015 treatment note on which Resch relies merely suggests that some of her medications could cause dizziness and fatigue. The physician did not opine as to whether Resch actually suffered from symptoms caused by the side effects of her medications.

Finally, Resch argues that the ALJ failed to consider the significant limitations to her daily activities. In particular, Resch reported that she did very little during the day, suffered a lot of fatigue, and became exhausted after engaging in any activity. She testified at the administrative hearing that when going down stairs, she was required to sit and "scoot down one step at a time" and going up the stairs consisted of "getting on all fours and crawling up the stairs." R. 42. But it is not unreasonable to believe that if she truly was unable to get out of bed for substantial portions of the week or she was required to crawl up and down the stairs, Resch would have mentioned it to her doctors. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[A] discrepancy

8

between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."). Again, during the time period under consideration, Resch presented for only two medical examinations, hardly what one would expect if she was truly experiencing the debilitating symptoms she claims. Given the lack of medical findings of severe disability and the absence of consistent complaints in her medical records, the ALJ reasonably concluded that Resch's alleged symptoms and limitations were inconsistent with the record.

Despite the ALJ's conclusion that Resch's statements were not consistent with the record, she did not reject Resch's statements in their entirety. She instead formulated an RFC that accommodated for Resch's migraines, vertigo, and associated symptoms by limiting her to work at the medium exertional level with additional limitations on her exposure to hazards and noise. The ALJ followed the regulations governing the assessment of a claimant's statements concerning her symptoms and alleged limitations, and her conclusion is not patently wrong. Her assessment of Resch's subjective symptoms and related limitations therefore does not necessitate remand.

**B. State Agency Opinions**

Resch next challenges the ALJ's reliance on the opinions of the state agency physicians, Dr. Mina Khorshidi, Dr. Mary McLarnon, and Dr. Gary Spitz. Dr. Khorshidi completed her physical residual functional capacity assessment in September 2014. After reviewing the medical evidence through April 2013, she found that Resch had a medium RFC with the following limitations: occasionally lift or carry 50 pounds, frequently lift 25 pounds, and avoid even moderate exposure to hazards. R. 82. At the reconsideration level, Resch's counsel submitted additional medical records from November 14, 2014, through March 13, 2015, for review. After reviewing the record, Dr. McLarnon agreed with the limitations recommended by Dr. Khorshidi regarding Resch's

orthopedic and neurological illness. R. 94. Dr. Spitz completed a second RFC assessment on April 24, 2015. He found that, based on her history of dizziness, Resch should never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally balance; and is precluded from work "requiring driving, working at unprotected heights, or with hazardous machinery (avoid concentrated exposure to hazards)." R. 96. The ALJ gave great weight to the opinions of Drs. Khorshidi and McLarnon, reasoning that their opinions are consistent with the clinical findings during the relevant period found in Resch's medical records. R. 24–25. She gave less weight to Dr. Spitz' opinion that, due to dizziness, Resch could occasionally climb ramps and stairs, could occasionally balance, and should have avoided concentrated exposure to hazards, noting that the clinical findings were inconsistent with these additional limitations. R. 25.

Resch asserts that the ALJ erred in failing to obtain an updated medical opinion regarding her new medical records pertaining to her POTS and superior semicircular canal dehiscence diagnosis. The Seventh Circuit has held that an ALJ may not rely on the opinion of a state agency physician that did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). In this case, although Dr. Khorshidi did not review the updated medical records before offering an opinion about Resch's RFC, the ALJ did not solely rely on her opinion. The state agency physicians at the reconsideration level reviewed the records and other evidence of Resch's conditions during the relevant time period as well as the records of treatment that occurred in the following months. After reviewing the medical records regarding POTS and superior semicircular canal dehiscence, Dr. McLarnon

10

affirmed the limitations assessed by Dr. Khorshidi. The ALJ gave Dr. McLarnon's opinion great weight. Because Dr. McLarnon concluded no additional limitations were warranted based on this new evidence, it thus follows that the later medical evidence would not have reasonably changed Dr. Khorshidi's opinion. Resch's record contains no additional opinions or examinations indicating that she had greater functional limitations than those found by the state agency physicians. As a result, the ALJ did not err in accepting the state agency physicians' opinions.

Finally, Resch asserts that the ALJ overlooked statements by Dr. Rave, Resch's treating physician. Generally, the ALJ must give controlling weight to the medical opinion of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R. § 416.927(c)(2). If the ALJ decides to give lesser weight to a treating physician's opinion, she must articulate "good reasons" for doing so. *Larson*, 615 F.3d at 749. Not all statements by treating physicians qualify as medical opinions, however. This is especially true when the physician simply records the patient's complaints. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1).

In this case, the ALJ did not err in evaluating the opinion of Dr. Rave because he did not offer any opinion on what Resch's functional limitations actually were. Like most health care professionals, Dr. Rave wrote down what Resch told him about her pain, assumed she was telling the truth, performed a physical examination, and prescribed medications in the hope that they would

11

alleviate the symptoms she described. He did not offer any opinion as to what Resch could or could not do in a work setting. Therefore, Dr. Rave's statements presented no conflict that the ALJ was required to resolve before adopting the opinions of the state agency physicians.

Resch argues that, even if Dr. Rave's statements were not medical opinions, the ALJ improperly cherry-picked evidence from the record and ignored Dr. Rave's statements. In particular, in an August 4, 2014 treatment note, Dr. Rave indicated:

> I'm not sure what more to do. The patient does not want to make any changes at this time anyway. So I think keeping things where they are is best. . . . We did talk about how accepting and giving up are not the same thing, that there is a difference. She is going to be limited in what she can do. In general, she does need to have a degree of activity or else the less she does, the less she will be able to do, but if she overdoes it, she will "pay for it." She will have to select those times and decide how much it is worth it, and that can be very difficult, especially as that can change day to day.

R. 295. On August 10, 2015, eight months after the relevant time period, Dr. Rave stated, "We talked about just treating symptoms, which is what we are trying to do and keep her as active as possible, but she is very limited and cannot do much." R. 396.

These notes are not inconsistent with the ALJ's RFC finding. Dr. Rave was obviously expressing his frustration over the failure of the treatment he was providing to eliminate the symptoms Resch was claiming. At the same time, however, he notes that "[t]he patient doesn't want to make any changes at this time anyway," and the fact that "she does need to have a degree of activity or else the less she does, the less she will be able to do." R. 295. Dr. Rave had previously noted that he had been unable to find a cause of her problems and had resigned himself to treating her symptoms. R. 303. Having failed to find a cause of her symptoms, he could offer little other than her own reports as to their intensity, persistence, and limiting effect. In short, there

12

is no evidence that the ALJ ignored Dr. Rave's treatment notes. The ALJ's evaluation of the medical evidence was not unreasonable and remand is therefore not warranted.

## CONCLUSION

For the reasons given above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   10th   day of April, 2019.

s/ William C. Griesbach<br>
William C. Griesbach, Chief Judge<br>
United States District Court